**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

EMPERY TAX EFFICIENT, LP,

Plaintiff,

- against -

MUSCLEPHARM CORPORATION, WHITE WINSTON
SELECT ASSET FUNDS, LLC,  WHITE WINSTON
SELECT ASSET FUND SERIES MP-18, LLC, and
RYAN DREXLER,

Defendants.

Case No.: 1:23-cv-00074-VM

<u>AMENDED COMPLAINT</u>

Plaintiff Empery Tax Efficient, LP ("Empery"), on behalf of itself and as collateral agent ("Collateral Agent") to the holders (the "Secured Noteholders") of both Original Issue Discount Senior Secured Notes dated as of October 13, 2021 (the "October Notes") and Original Issue Discount Senior Secured Notes dated as of June 10, 2022 (the "June Notes") (collectively with the October Notes, as amended, the "Notes"), by and through its attorneys, Schulte Roth & Zabel LLP, brings this Complaint against Defendants White Winston Select Asset Fund Series MP-18, LLC ("White Winston Series Fund"), White Winston Select Funds, LLC ("White Winston SAF" and collectively with White Winston Series Fund, "White Winston") and Ryan Drexler ("Drexler").  In support thereof, Empery hereby alleges as follows:

<u>NATURE OF THE ACTION</u>

1.      This is an action to obtain damages from a self-dealing former chief executive officer ("CEO") of a publicly held company and two unsecured equity holders who acted upon a backroom deal to flagrantly deprive secured creditors of their unambiguous rights.

2.      Empery is a noteholder and Collateral Agent to certain noteholders (collectively, the "Secured Noteholders") of the Notes issued by MusclePharm Corporation ("MusclePharm"

or the "Company"), pursuant to an initial transaction in October 2021.  In exchange for the Secured Noteholders' initial investment of $7 million, the Company issued senior secured notes that granted the Secured Noteholders with certain critical protections, which included, among other things, an agreement not to incur additional debt, nor change effective control, without the Secured Noteholders' consent.

3.     Following months of disastrous performance and numerous defaults of its obligations under the Notes that preceded and are in addition to the defaults described in this action, the Secured Noteholders declared an "Event of Default" and accelerated the Company's payment obligations, as they were contractually entitled to do.  Empery and the Company's chief restructuring officer tried to convince MusclePharm to reorganize under chapter 11 of the Bankruptcy Code, but were unsuccessful.  The Secured Noteholders therefore were left with no other options and initiated proceedings to foreclose on certain of the Company's assets in an auction that was scheduled to take place on December 15, 2022 (the "Article 9 Sale").

4.     Backed into the proverbial corner, White Winston, an unsecured equity holder, conspired with Drexler to take action with malice and by fraudulent and illegal means so that the Company would avoid its obligations to the Secured Noteholders.  Specifically, with knowledge of the upcoming auction and the Company's agreements with the Secured Noteholders, White Winston and Drexler entered into an agreement with the Company purporting to settle, *inter alia*, *prior* litigation between them (the "Settlement Agreement").  In reality, however, that Settlement Agreement was transparently and actually intended to subvert the Secured Noteholders' rights. Indeed, upon information and belief, Drexler crafted that deal specifically to incentivize White Winston to attack the Secured Noteholders' interests.

5.     Had the transaction contemplated by the Settlement Agreement closed, it would have not only fraudulently conveyed $500,000 to an unsecured equity holder over which the

Secured Noteholders have clear priority, but more importantly would have given that unsecured equity holder effective control of the Company. Both actions are plainly contrary to the covenants in the Notes and would have irreparably harmed the Secured Noteholders. In addition to being a breach of certain agreements, the Settlement Agreement is also a voidable transaction under New York's Uniform Voidable Transactions Act ("UVTA"), which statute entitles Empery to injunctive relief. N.Y. Debt. & Cred. Law §§ 273-274, 276.

6.      Accordingly, Empery, on behalf of itself and as Collateral Agent and on behalf of the Secured Noteholders, filed this action originally to enjoin the consummation of the Settlement Agreement and preclude the Company from issuing the $500,000 payment to White Winston, preclude White Winston from gaining proxy rights over in excess of 33% of the voting securities of the Company, and preclude Drexler and White Winston from reconstituting the board of directors to give White Winston control of the Company. This relief was important to the Secured Noteholders because White Winston told Empery that once it obtained control of the proxy voting rights of the Company it would preclude the imminent auction, which would cause irreparable injury to the Secured Noteholders and their collateral. Accordingly, Empery sought and obtained a temporary restraining order (the "Temporary Restraining Order") that would not only enforce the Company's clear obligations, but protect the Secured Noteholders from irreparable injury and help preserve the value of their collateral. At the same time, MusclePharm sought to enjoin the Article 9 Sale, which injunction was denied.

7.      Undaunted, over the course of the several hours immediately following the Court's Temporary Restraining Order, Drexler, who had days before unconditionally resigned as CEO, and White Winston exerted unauthorized control over MusclePharm. Together, and without any authority or the required MusclePharm board action, White Winston and Drexler took control of the Company and caused MusclePharm to file a petition for Chapter 11

3

bankruptcy and stopped the Article 9 Sale three minutes after it began.  In essence, White Winston and Drexler consummated the Settlement Agreement because they effectuated the change of control provisions therein.  White Winston and Drexler thereafter continued to knowingly violate the Temporary Restraining Order by "taking other action to dispose of Company assets" on terms highly favorable to White Winston and to the detriment of other unsecured creditors and the Secured Noteholders.

8.      While the initiation of the bankruptcy stays any action as to MusclePharm, the bankruptcy does not alleviate White Winston or Drexler under any stretch of any theory of law from having to comply with the Temporary Restraining Order or otherwise alleviate them from liability from tortiously interfering with the Secured Noteholders' contracts with the Company and using dishonest, unfair and improper means to extinguish the Secured Noteholders' prospective economic advantage from the Article 9 Sale.  Accordingly, Empery seeks to hold White Winston and Drexler responsible for the significant losses that the Secured Noteholders have suffered by virtue of the fact that, with malice, and by fraudulent, dishonest, improper and illegal means, they interfered with the Secured Noteholders' relationship with MusclePharm, hindered, delayed and defrauded the Secured Noteholders' rights to be repaid under the Notes, and diminished the value of the Secured Noteholders' collateral and their ability to be repaid.

## THE PARTIES

9.      Empery is a limited partnership formed in the state of Delaware, and its principal place of business is in New York, New York.  It is a noteholder, acts as the Collateral Agent to the Secured Noteholders and is managed by Empery Asset Management, LP.

10.     White Winston Series Fund is a Delaware limited liability company, with a principal place of business in Boston, Massachusetts.

4

11.    White Winston SAF is a Delaware limited liability company, with its principal place of business in Boston, Massachusetts.

12.    Drexler is an individual who, upon information and belief resides in Nevada and who conducted business regarding the transactions described herein in New York.

## JURISDICTION AND VENUE

13.    Drexler removed this action to federal court on January 5, 2023 and Drexler alleges that the Court has jurisdiction under 28 U.S.C. § 1334(b) because the claims and causes of action herein relate to a case under title 11 of the Bankruptcy Code, specifically the MusclePharm bankruptcy.  (*See* Doc. No. 1.)  Empery disagrees and is seeking remand.  If this Court has jurisdiction, venue is proper in this district under 28 U.S.C. § 1491(b) because, as is detailed below, a substantial part of the events or omissions giving rise to the claim occurred in New York City.

14.    The New York Supreme Court, New York County, should hear this case.  That court has personal jurisdiction over White Winston and Drexler pursuant to CPLR § 302 and venue in that court is proper in New York County pursuant to CPLR § 503 in that at least one party resides in this county.

## FACTUAL ALLEGATIONS

The SPA and Notes Issued Thereunder

15.    MusclePharm is a performance lifestyle company that develops, manufactures, markets and distributes functional energy beverages.  On October 13, 2021, Empery, along with several other initial purchasers of notes (collectively, the "Initial Purchasers"), entered into a Securities Purchase Agreement with MusclePharm to provide MusclePharm with millions of dollars in funding for desperately needed working capital, including the purported rollout of an energy performance drink.

16.    On June 3, 2022, Empery and several other subsequent purchasers of notes (such subsequent purchasers, the "Subsequent Purchasers")[1] entered into the Amended and Restated SPA to provide MusclePharm with additional financing and extend the maturity date of the notes purchased by the Initial Purchasers.

17.    Under the terms of the SPA and the Amended and Restated SPA, Empery was the appointed "Collateral Agent" for the Secured Noteholders, with the power and authority to enforce the Secured Noteholders' rights under the Notes.

18.    The aggregate principal amount of securities the Secured Noteholders purchased in the October transaction was $8,197,674.42, which principal amount was increased to $9,759,315 in connection with the June amendment and restatement.  The Principal Amount of securities purchased by the Subsequent Purchasers in the June transaction was $3,081,875.  The Secured Noteholders' purchases are evidenced by the Notes.  The October Notes were due on April 13, 2022, but had provisions that allowed for a total extension of not more than 45 days (*i.e.* to May 28, 2022). The maturity date for all of the Notes was subsequently extended to December 10, 2022, which came and went without the Notes being repaid.  The current aggregate principal amount of the Notes, inclusive of accrued and unpaid interest, exclusive of default interest, default premium and legal fees, is now approximately $13.9 million.  Inclusive of default interest, default premium and legal fees, the amount due under the Notes is in excess of $18 million.

---

[1]  For the avoidance of doubt, the Initial Purchasers and the Subsequent Purchasers collectively constitute the Secured Noteholders.

Relevant Protections provided to the Secured Noteholders under the Notes

19.    Section 3 of the Notes provides certain protections to the Secured Noteholders in the form of negative covenants, which reflect promises by the Company not to undertake the actions memorialized in Section 3 "[a]s long as any portion of this Note remains outstanding...."

20.    Specifically, Section 3(a) prohibits the Company from incurring any Indebtedness[2] except for certain limited exceptions consisting primarily of Indebtedness in existence at the time the Notes were issued, limited amounts of ordinary course Indebtedness and Indebtedness that is subordinated to the Notes pursuant to an express written subordination agreement with the Secured Noteholders ("Permitted Junior Indebtedness").

21.    Section 3(b) prohibits the Company from incurring any Liens except for certain limited exceptions consisting primarily of Liens securing Indebtedness permitted under the Notes, tax Liens and ordinary course Liens.  Importantly, the Company is not permitted to incur any Liens in connection with Permitted Junior Indebtedness.

22.    Section 3(e) prohibits the Company from "repay[ing] . . . any Indebtedness," with limited exceptions for payments made in connection with certain categories of Indebtedness that are expressly permitted under the Notes.

23.    Lastly, Section 3(h) provides a general prohibition against the Company "consummat[ing] any agreement with respect to" the negative covenants in the Notes, meaning that the Company is not only prohibited from taking the actions articulated in the other provisions of Section 3, but also from *agreeing* to take any such actions in the future.

24.    The Notes also protect the Secured Noteholders in the event of a "Change of Control Transaction," which the Notes defined as an "acquisition...by an individual or legal

---

[2] Indebtedness is defined to include, among other things, any "amounts owed in excess of $50,000".

entity...of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 33% of the voting securities of the Company." Change of Control Transactions further include "the consummation by the Company of an agreement to which the Company is a party or by which it is bound, providing for any events set forth in clauses (a) through (d) above," which clauses include the acquisition of control, via proxy voting rights of "in excess of 33% of the voting securities of the Company."

25.     Any breach of the negative covenants, or occurrence of a Change of Control Transaction, constitutes an "Event of Default" under Section 5 of the Notes. Upon the declaration of an Event of Default, the Secured Noteholders are entitled to, among other things, immediate repayment of "the outstanding principal amount of this Note plus accrued but unpaid interest."

26.     Section 7(g) of the Notes also contains a specific acknowledgement and agreement by the Company that the remedies in any breach of the Notes would entitle the Secured Noteholders to any remedies available at law or in equity, including injunctive relief:

> The remedies provided in this Note shall be cumulative and in addition to all remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief) . . . The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or any such threatened breach, without the necessity of showing economic loss and without any bond or other security being required.

27.     Finally, the authority of Empery to bring legal action on behalf of the Secured Noteholders is explicit in Section 9 of the Pledge and Security Agreement ("Pledge and Security Agreement") that was entered into in connection with the issuance of the October Notes: "if any Event of Default shall have occurred and be continuing . . . the Collateral Agent may exercise in

8

respect of the Collateral, in addition to any other rights and remedies provided for [in the Pledge and Security Agreement] or otherwise available to it, all of the rights and remedies of a secured party upon default under the Code…."

The Company Defaults on the Notes

28.     In early May 2022, MusclePharm informed Empery that it was unable to pay the October Notes by their maturity date, the failure of which constituted an Event of Default.  In what would be a foreshadowing of numerous false promises to come, MusclePharm made overtures about significant growth opportunities and began negotiating an amendment to the SPA and the issuance of additional notes.  The Secured Noteholders waived the Event of Default that occurred on the maturity date and on June 3, 2022, MusclePharm entered into the Amended and Restated SPA, which increased the principal amount of the October Notes, provided for the issuance of the June Notes and extended the Notes' maturity date to December 10, 2022.

29.     Although the Secured Lenders extended the Company a lifeline with the Amended and Restated SPA, the Company's economic situation only deteriorated.  Among other things, following the execution of the Amended and Restated SPA, Empery discovered that the Company had concealed from it numerous and substantial undisclosed loans, that Drexler was wiring hundreds of thousands of dollars to his personal accounts, and that vendors and suppliers and employees were collectively prepared to cut their losses and sever their ties with the Company, placing the future of the Company in serious jeopardy.

30.     At the same time, over the summer of 2022 the Company routinely breached its covenants under the Notes issued to the Secured Noteholders and representations to the Senior Noteholders in the SPA and the Amended and Restated SPA.

31.     On September 22, 2022, Empery sent an Event of Default Redemption Notice, signed by a number of the Secured Noteholders.  Empery received no response from MusclePharm or its board of directors or counsel.

32.     On September 29, 2022, Empery sent a follow up email to the MusclePharm board of directors and its counsel, warning them that Empery had not received a response to their default notice, that no 8-K had been filed disclosing that notice, and that the Secured Noteholders would "begin to take action to secure our collateral if we do not hear from you."  Empery received no response from MusclePharm or its counsel.

33.     By late November 2022, Mill Haven Foods, LLC, a key supplier of dry dairy powders to MusclePharm, was owed $3.8 million and was threatening legal action.  And Mill Haven was not the only one.  By mid-November, MusclePharm had alienated all of its vendors and suppliers to the point where they refused to do business with MusclePharm under the current status quo and Drexler's involvement.

34.     Accordingly, on November 28, 2022, Empery emailed MusclePharm's board and encouraged it "to engage in a dialogue for an organized Chapter 11 in order to maximize the value for all stakeholders."  At the time, MusclePharm employed a Chief Restructuring Officer ("CRO").  Empery made this overture because it understood that Chapter 11 bankruptcy was "the recommendation of the [CRO] and we believe that it is the Board's fiduciary responsibility to proceed down this restructuring path."

35.     Unfortunately, the Company, through its then CEO, Drexler, made it extremely clear to Empery and everyone who asked that the Company would ***never*** file for bankruptcy protection.  Instead, MusclePharm refused the CRO's advice, restricted him from communicating with Empery, and, upon information and belief, subsequently stopped compensating the CRO presumably so he would resign. Empery thus had no choice but to pursue the Article 9 Sale to

salvage the remaining value of the collateral for a company that had not been operating, was not operating and had no ability to resume operations given the number of lawsuits, judgments and mounting payables. On November 30, 2022, Empery began its public notice campaign of the Article 9 Sale.

MusclePharm Enters into a Voidable Settlement Agreement Days Before the Secured Noteholders' Foreclosure

36.    White Winston are unsecured equity holders in the Company and a plaintiff against the Company in various legal actions. Among other things, White Winston's legal challenge alleges that the Company and its directors breached their fiduciary duties by improperly approving the refinancing of three promissory notes issued to Drexler in exchange for $18.1 million in Company loans. White Winston alleges that the refinancing improperly diluted its economic and voting power and constituted improper distributions in violation of Nevada law.

37.    Drexler and White Winston are and have been well aware of the Notes, the Secured Noteholders' contractual and other relationship with the Company, and the impending foreclosure. They have been aware of all through conversations with the Collateral Agent, and numerous press articles, MusclePharm's public filings, and this action. Nevertheless, with knowledge of the pending foreclosure proceeding and the Company's obligations to the Secured Noteholders, White Winston and Drexler chose to enter into the Settlement Agreement, which not only seeks to disregard the rights of the Secured Noteholders, whose secured Notes sit unquestionably above White Winston's equity interest in the Company in priority, but also would have given control of the Company to White Winston on the eve of the auction, ostensibly to thwart the auction and the rights of the Secured Noteholders.

38.    Specifically, Drexler and White Winston entered into the Settlement Agreement, in which White Winston agreed to drop its claims against the Company and Drexler in exchange for concessions from them that plainly violate the Company's obligation under the Notes.  In addition, the Settlement Agreement constitutes both an actual and constructive fraudulent conveyance.

39.    Upon information and belief, Drexler approached White Winston and encouraged it to enter into the Settlement Agreement, as well as take all of the other actions described herein, specifically to attack, delay, hinder and defraud Empery's and the Secured Noteholders' ability to be repaid under the Notes.  Drexler's and White Winston's actions taken, as described herein, were made with malice and for a wrongful purpose and Drexler and White Winston used dishonest, unfair, and improper means.  Indeed, the actions taken on and after December 15, 2022 were not made with the proper corporate authority and were plainly contrary to the Temporary Restraining Order.  As such, Drexler's and White Winston's actions are also fraudulent and illegal.

40.    By the Settlement Agreement, the Company agreed to pay White Winston a total of $4,000,000, which cash payments would be secured by junior liens on all assets of MusclePharm and its subsidiaries.  The Settlement Agreement also contains a provision compelling the Company to pay $500,000 of the consideration in cash on or before January 4, 2023 (the "Settlement Installment").  Despite the allegations against Drexler, the Settlement Agreement does not require that he pay anything.

41.    Incredibly, the Company and Drexler (who was then the CEO) did not seek the Secured Noteholders' consent prior to agreeing to incur (or repay) this Indebtedness as it is required to do under Section 3 of the Notes.  Moreover, the Company agreed to incur the Indebtedness and make the upcoming Settlement Installment notwithstanding the fact that the

Company has failed and refused to pay the Secured Noteholders a single dollar despite the declaration of an Event of Default and the acceleration of the amounts owed under the Notes on September 22, 2022.

42.    As an additional payment to White Winston, the Company agreed to issue a convertible bond to White Winston in the amount of $4,630,261 (the "Convertible Bond"), which bond would be secured by junior liens on all assets of MusclePharm and its subsidiaries. The Company's issuance of the Convertible Bond violates Section 3(a) of the Notes, which prohibits the Company from incurring any Indebtedness other than what is expressly permitted under the Notes.  The Notes allow the Company to incur Indebtedness that is expressly subordinated to the Notes pursuant to a written subordination agreement approved by the Collateral Agent.  However, neither the Company nor White Winston have entered into any such written subordination agreement with the Collateral Agent with respect to the Convertible Bond.

43.    Moreover, the Company's incurrence of junior liens to secure the cash payments and the Convertible bond violates Section 3(b) of the Notes, which prohibits the Company from incurring any Liens except as expressly permitted under the Notes.  None of the categories of Liens permitted under the Notes are applicable here.

44.    Section 8(a) of Settlement Agreement provides that "MusclePharm shall expand its board of directors to seven (7) members...."  Of the seven board members, two are to be designated by White Winston, two are to be designated by Drexler, three are to be independent directors that are mutually agreeable to the four directors that White Winston and Drexler appoint.  Additionally, White Winston and Drexler may appoint two non-voting observers.

45.    The Company and Drexler also agreed to terms in Section 8, which when consummated, would constitute a Change of Control Transaction, yet another Event of Default under the Notes. Specifically, the Company agreed in Section 8(e) of the Settlement Agreement

that Drexler would "grant a proxy to White Winston to vote all of his and their shares in

MusclePharm in favor of the persons designated as members of the Board pursuant to 8a…or at

any special stockholders' meeting called for the purpose of electing directors for a period of the

greater of (i) the period in which any of the White Winston Debt remains outstanding, or (ii) five

(5) years from the dismissal of the Actions."

46.    Upon information and belief, and based upon the Company's latest public filings,

Drexler controls in excess of 18 million shares, which comprises more than 50% of the shares

outstanding.

47.    Thus, pursuant to the Settlement Agreement, Drexler purported to grant White

Winston a proxy of effective control of in excess of 33% of the voting securities of the

Company.

48.    This grant of voting rights constitutes a Change of Control Transaction under the

Notes, the occurrence of which is an Event of Default.  A Change of Control Transaction is

defined to include, among other things, the "acquisition . . . by an individual or legal entity . . . of

effective control (whether through legal or beneficial ownership of capital stock of the Company,

by contract or otherwise) in excess of 33% of the voting securities of the Company".  Moreover,

the Company's agreement to the Settlement Agreement is a Change of Control Transaction

because "the consummation by the Company of an agreement to which the Company is a party

or by which it is bound, providing for [among other things, an acquisition of in excess of 33% of

the voting securities of the Company]" is a Change of Control Transaction.

<u>MusclePharm was Insolvent and Failed to Pay the Notes When they Came Due on December 10</u>

49.    At the time Empery noticed the Article 9 Sale, the Company was clearly

insolvent, rending the Secured Noteholders effectively powerless to recover by exercising their

right to declare an Event of Default and making the impending foreclosure sale critical to the

Secured Noteholders ability to recover on the Notes. *First,* in its most recently filed Form 10-Q, the Company reported total liabilities of $50 million and total assets of $12 million. *Second*, upon information and belief, in recent months, the Company has missed payroll on more than one occasion, and has made partial payrolls only because certain employees have foregone their own paychecks. *Third*, the Company currently does not have sufficient capital to pay its vendors and for that reason is not able to buy required raw materials, produce or ship product.

50.     *Fourth,* the Company has a revolving door of judgments and judgment creditors against it, including debts of more than $3.8 million to Mill Haven for ordinary course payables, more than $5.0 million to S.K. Laboratories for ordinary course payables, $335,000 to Kasowitz Benson Torres LLP for unpaid legal services, and additional debts owed to its former intellectual property counsel, who resigned "after repeated and countless requests" and after he was told the Company was "unable to pay me."

51.     *Fifth,* the Secured Notes were accelerated on September 22, 2022, and matured on December 10, 2022, but the Company has been unable to repay any portion of the Notes at all, total principal and interest (inclusive of default interest, default premium and legal expenses) exceeds $18 million.

52.     Indeed, as explained below, immediately after the Article 9 Sale began, Drexler and White Winston wrongfully interfered with and stopped the auction, thereby tortiously interfering with the prospective economic advantage that the Secured Noteholders would have obtained from the completion of the sale.

White Winston and Drexler Interfere Illegally and with Malice

53.     Upon information and belief, Drexler intended to and did incentivize White Winston to join him in attacking the interests of the Secured Noteholders, including by using dishonest, unfair, or improper means. Indeed, following execution of the Settlement Agreement,

White Winston's partner, Todd Enright, reached out to Empery and—in what would be the first of many times, including at the hearing on the Temporary Restraining Order—implored Empery delay the Article 9 Sale for 30 days. When Empery refused, believing an immediate sale was necessary to preserve its collateral, Enright made clear that without a standstill, White Winston was going to make sure that the Company would file for Chapter 11 to halt the sale.

54.    Given MusclePharm's board's adamant and repeated refusal to even consider Chapter 11, Empery knew that MusclePharm would not file for bankruptcy to stop the Article 9 Sale. Indeed, it did not. Instead, MusclePharm unsuccessfully sought at the eleventh hour to enjoin the sale in this Court. At the same time, Empery sought and obtained the Temporary Restraining Order specifically to preclude White Winston from exerting control over MusclePharm for the benefit of itself over the many other unsecured creditors and the Secured Noteholders, including orchestrating a Chapter 11 filing. Empery also sought and obtained the Temporary Restraining Order specifically to preclude White Winston and Drexler from taking other actions to dispose of MusclePharm assets, which would impair the Secured Noteholders' ability to be repaid.

55.    Approximately 30 minutes before the Article 9 Sale was to begin, Empery heard rumors that MusclePharm was about to file for bankruptcy protection at the direction and with the assistance of White Winston and Drexler. Empery viewed White Winston's and Drexler's control over MusclePharm's sudden decision to file for Chapter 11 as a consummation of the change of control provisions contemplated by the Settlement Agreement. Empery immediately reminded White Winston and Drexler in writing that the orally-granted Temporary Restraining Order precluded such behavior. Empery warned, "Should this come to pass, Empery will not hesitate to seek all available remedies to it, including without limitation, contempt of court. Govern yourselves accordingly." By 12:38 p.m. PST – 42 minutes before the Article 9 Sale was

16

to begin, Empery served a copy of the Temporary Restraining Order on White Winston and Drexler and notified them that a Notice of Entry would be filed imminently. In response, White Winston admitted that it was "consulting" with MusclePharm and took the position that encouraging MusclePharm to file for bankruptcy protection did not violate the Temporary Restraining Order.

56.    But White Winston did not simply encourage MusclePharm to file for bankruptcy protection. Instead, White Winston and Drexler—again, who upon information and belief had resigned as CEO—made the decision for MusclePharm that it should file a Petition for Chapter 11 Bankruptcy three minutes after the Article 9 Sale began. The filing of the Petition stopped the auction immediately prior to the first bid. ***Shockingly, upon information and belief, Drexler, in consultation with White Winston, made misrepresentations to the bankruptcy court in the Petition to start the proceeding and stop the Article 9 Sale***.

57.    Article 3 of MusclePharm's Second Amended and Restated Bylaws, adopted effective as of September 27, 2016 pursuant to its Articles of Incorporation (the "Corporate Bylaws") permit its Board of Directors (the "MusclePharm Board") to exercise its powers through regular meetings, special meetings, or a written consent in lieu of a meeting. Upon information and belief, the MusclePharm Board did not notice or convene a special meeting or execute a written consent in lieu of a meeting in advance of the filing. Instead, the bankruptcy petition attaches a purported "Action by Written Consent of Chief Executive Officer of MusclePharm Corporation" that evidences that Drexler initiated the bankruptcy without consulting or obtaining the consent or approval of the MusclePharm Board. Despite that fact, Drexler signed the initiating papers as MusclePharm's CEO. Moreover, Drexler represented to the bankruptcy court that MusclePharm's principal place of business was a location that it abandoned.

17

58.     Upon information and belief, MusclePharm clearly would not have filed—and did not file—the Petition for Chapter 11 Bankruptcy but for White Winston's and Drexler's ultra vires direction and control.  In so doing, they consummated the terms of the Settlement Agreement because White Winston exerted control over the Company, either as a de facto board of directors or by proxy in excess of 33% of the voting securities of MusclePharm.  Their actions were also taken using dishonest, unfair, and improper means given that the MusclePharm Board did not approve of the action and only weeks before had indicated the Company would not file for bankruptcy.  Their actions also were fraudulent and illegal because the Petition contained purposeful misrepresentations and because the Temporary Restraining Order legally restrained such behavior.

59.     Thereafter, despite that they were precluded from doing so, White Winston and Drexler have consistently taken actions in the bankruptcy to thwart Empery's ability to be repaid and to dispose of Company assets in violation of the Temporary Restraining Order.  Indeed, White Winston and Drexler are using and taking part in the bankruptcy proceeding for the purpose of disposing of Company assets in their favor and to the detriment of the Secured Noteholders.  Notably, there are many ways in which White Winston could participate in the bankruptcy process that do not violate the Temporary Restraining Order.  For example, White Winston could propose debtor-in-possession ("DIP") financing that is simply a short term loan to the Company that does not attempt to prime the debt of the Secured Noteholders or to obtain a security interest in the collateral of the Secured Noteholders.  But it has not.

60.     Beginning on December 19, 2022 and carrying through to the expiration of the Temporary Restraining Order, White Winston and Drexler proposed a Debtor-in-Possession Factoring and Loan Term Sheet that outlines a proposed agreement between White Winston and MusclePharm, which would dispose of Company property by conveying it to White Winston.

There cannot be a clearer violation of the Temporary Restraining Order. Among other things, the DIP proposals sought to pay White Winston's attorneys' fees with respect to ***this action***, as well as ***six*** other lawsuits arising from White Winston's dealings with MusclePharm.

61.     The DIP proposals also propose to grant a security interest in the very assets that make up the Secured Noteholders' collateral (thus completely "priming" the Secured Noteholders' interest in the collateral) and that were subject to the improperly cancelled Article 9 Sale. And, if the foregoing is not enough to make clear that White Winston and Drexler are seeking to consummate the Settlement Agreement and dispose of Company assets, White Winston's December 19 DIP proposal references and purports to attach the Settlement Agreement and states that upon the termination of the Temporary Restraining Order, MusclePharm shall implement the scheme expanding the board and appointing members per the Settlement Agreement. The later DIP proposals have slightly different terms regarding reconstituting the board, but it in sum and substance still consummates the Settlement Agreement because it gives White Winston control of the MusclePharm board.

62.     Moreover, White Winston all but admitted that it was violating the Temporary Restraining Order by suggesting that the filing of the bankruptcy petition somehow magically released them from it. Specifically, on December 20, 2022, White Winston reached out to Empery, alleging "MusclePharm's bankruptcy mooted the TRO entered by Judge Masley" and asked Empery to stipulate to vacating the Temporary Restraining Order. Empery refused to do so and warned White Winston that its DIP proposal violates the Temporary Restraining Order.

63.     Undaunted, White Winston and Drexler continue to take actions that increasingly serve to enrich them to the detriment of the Secured Noteholders. Defendants actions not only devalued the collateral, they now seek to grant a superior security interest in the Secured Noteholders' collateral to White Winston. To be clear, White Winston and Drexler certainly

have the right to make and support DIP financing proposals, but when those proposals sought to convey MusclePharm assets to White Winston, they run afoul of the Temporary Restraining Order and White Winston and Drexler must be held accountable to the Secured Noteholders for any damage that such proposals caused.

White Winston's and Drexler's Actions Have Damaged Empery and the Secured Noteholders.

64.    White Winston and Drexler's actions have caused Empery and the Secured Noteholders to suffer harm.  Specifically, the Secured Noteholders have lost the value of the time and money that they spent on the Article 9 Sale and this action, the diminution in the value of the collateral caused by the delay, as well as the disposition of assets that otherwise would have been available to pay the Secured Noteholders.   Accordingly, White Winston and Drexler are liable to Empery for an amount to be proven at trial that is not less than $18 million.

65.    Indeed, White Winston and Drexler intended to interfere with the Secured Noteholders' rights maliciously, fraudulently and illegally and used dishonest, unfair, and improper means to do so.  Their interference has impaired the value of the collateral to Empery's and the Secured Noteholders' detriment.  White Winston and Drexler appear to have had a pre-baked plan to give White Winston control over the Company and transfer Company assets to White Winston that it was not entitled to under any means possible.  Indeed, Enright threatened Empery the day before Empery commenced this action, claiming that if Empery did not play ball, White Winston would sink the Company into bankruptcy and Empery would get pennies on the dollar.

66.    Accordingly, Empery was clear that when it moved to enjoin the consummation of the Settlement Agreement, the injunction was meant to: "preclude the Company from issuing the $500,000 payment to White Winston, preclude White Winston from gaining in proxy voting rights with respect to in excess of 33% voting securities of the Company, and preclude the

Company and White Winston from reconstituting the board of directors to give White Winston control of the Company.  White Winston has told Empery that once it obtains control . . . it will preclude the imminent auction, which would cause irreparable injury to the Secured Noteholders and their collateral."  But that is exactly what came to pass.  White Winston and Drexler gained and exerted control and precluded the auction without authorization and appropriate action from the MusclePharm Board.  That action also thus consummated the Settlement Agreement and violated the Temporary Restraining Order.

67.     White Winston and Drexler calculated these actions with malice to—and the actions actually did—defeat, impair, impede and prejudice Empery's and the Secured Noteholders' rights.  As explained at the hearing on the Temporary Restraining Order, the Article 9 Sale generated significant interest with at least eight qualified bidders (not including Empery), including three of MusclePharm's competitors, a key vendor and a large ecommerce retailer.  When the auction began, there were two bidders who were qualified to bid $30 million or more for the collateral.  Those two bidders were aware that Empery had the ability to credit bid up to the full amount of the outstanding Notes, with interest and other amounts due and owing, and qualified to participate in the auction well in excess of that amount.  Indeed, one bidder initially qualified to bid only up to $17 million, but later increased its qualified amount to $34 million.  As a result, had the assets been sold at auction on December 15, 2022, it likely would have been for an amount that paid Empery and the Secured Noteholders in full.  Moreover, had the assets been sold at auction, the MusclePharm brand could have been promptly revived without significant financial damage to the brand.

68.     Unfortunately, White Winston's and Drexler's actions have impaired, impeded and prejudiced (if not destroyed) the value of the collateral and, thus, Secured Noteholders' ability to be repaid in full.  Given the timing and pace of a bankruptcy proceeding, particularly at

this time of year, there is no hope that MusclePharm's suppliers and manufacturers will resume doing business with MusclePharm before the current inventory is largely—if not entirely—depleted from retailers' shelves and online stores.  As each day passes, the value of the Secured Noteholders' collateral is declining and the ability of MusclePharm to revive its business becomes more difficult and more remote.

69.     For example, upon information and belief, since the Chapter 11 filing, BJ Wholesale Club, a major retailer for MusclePharm, significantly reduced the size of a pending order and has taken the position that if MusclePharm does not meet shipment schedules that MusclePharm currently is unable to satisfy, it will replace MusclePharm's products with products from the Company's competitors.  This is exactly the situation that was and continues to be the greatest concern for the Secured Noteholders.  With each passing day, the value of the collateral is deteriorating in tangible ways and restarting the business will continue to be more difficult until it actually becomes impossible.

70.     Moreover, given that the White Winston DIP proposals seek to encumber the Secured Noteholders' collateral, if approved by the bankruptcy court, what is left may not even go to pay the Secured Noteholders.  Accordingly, White Winston's and Drexler's thwarting of the Article 9 Sale and actions to dispose of Company assets in White Winston's favor caused actual injury and loss to the Secured Noteholders.  The actual losses include the costs of the Article 9 Sale, the attorneys' fees incurred in pursuing this action, the diminution in the value of the collateral given the delay, and the disposition of collateral that otherwise would have been available to pay the Secured Noteholders, which totals not less than $18 million.

**FIRST CAUSE OF ACTION**
**(Tortious Interference with a Contractual Relationship)**

71.    Empery restates and incorporates the allegations in paragraphs 1 through 70.

72.    The Amended and Restated SPA, the Notes and the Pledge and Security Agreement are valid and binding agreements.

73.    White Winston and Drexler had actual knowledge of the Amended and Restated SPA, the Notes and the Pledge and Security Agreement.

74.    White Winston and Drexler willfully, intentionally, maliciously, and without reasonable justification tortuously interfered with, and induced and procured breaches by MusclePharm of the Amended and Restated SPA, the Notes and the Pledge and Security Agreement.

75.    Specifically, White Winston and Drexler caused the Company to incur indebtedness with respect to the Settlement Agreement.  Thereafter, despite having been enjoined in a Temporary Restraining Order and warned by Empery not to take action, White Winston and Drexler fraudulently, illegally and purposefully assumed control over MusclePharm and caused it to seek bankruptcy protection to stop the Article 9 Sale, convey Company assets to White Winston, and frustrate the Secured Noteholders' liens on the collateral.

76.    As a result of White Winston's and Drexler's wrongful actions, the Secured Noteholders have been injured and are entitled to recover compensatory damages, consequential damages, punitive damages, pre-judgment and post-judgment interest, and the attorneys' fees and costs Empery incurs in prosecuting this action.

## SECOND CAUSE OF ACTION
### (Tortious Interference with Prospective Business Advantage)

77.     Empery restates and incorporates the allegations in paragraphs 1 through 78.

78.     The Amended and Restated SPA, the Notes and the Pledge and Security Agreement are valid and binding agreements.

79.     Numerous Events of Default had occurred under terms of the Notes.

80.     Among other defaults, MusclePharm did not pay the Notes when they became due on December 10, 2022, and did not disclose to Empery that it was under investigation by the Securities Exchange Commission at the time of Empery's investment.

81.     As a result of MusclePharm's defaults, Empery, as Collateral Agent, had a contractually binding right to sell the collateral or any part thereof at such price that the Collateral Agent may deem commercially reasonable.

82.     Empery validly noticed the Article 9 Sale, which generated significant interest from potential bidders, many of whom qualified with amounts well in excess of the amount owed to Empery and the Secured Noteholders.

83.     Prior to the Article 9 Sale, White Winston and Drexler were enjoined from consummating the terms of the Settlement Agreement and from taking any action to dispose of Company assets.   The Settlement Agreement purported to give control over MusclePharm to White Winston and Drexler, who had, upon information and belief, resigned as CEO.

84.     Despite this injunction, White Winston and Drexler assumed control over the Company and caused MusclePharm to seek bankruptcy protection specifically to stop the Article 9 Sale.  The bankruptcy Petition contained misrepresentations, including without limitation that Drexler was the CEO and that the Company was operating at a location where it was not.  Nor was the bankruptcy Petition duly authorized by the Company's Board of Directors.

85.     Accordingly, by exerting control over MusclePharm, White Winston and Drexler willfully, intentionally, maliciously, and without reasonable justification and by using dishonest, unfair, and improper means stopped the Article 9 Sale three minutes after it began and interfered with the bidders and the prospective economic benefits that Empery and the Secured Noteholders would have received from a sale of MusclePharm's collateral.

86.     As a result of White Winston's and Drexler's wrongful actions, the Secured Noteholders have been injured and are entitled to recover compensatory damages, consequential damages, punitive damages, pre-judgment and post-judgment interest, and the attorneys' fees and costs Empery incurs in prosecuting this action.

## PRAYER FOR RELIEF

WHEREFORE, Empery Tax Efficient, LP, as Collateral Agent to the Secured Noteholders, respectfully requests a judgment as follows:

(a)     Entry of an order finding Drexler and White Winston liable for tortious interference with a contract;

(b)     Entry of an order finding Drexler and White Winston liable for tortious interference with prospective economic advantage;

(c)     Award Empery, on behalf of itself and as Collateral Agent for the Secured Noteholders, compensatory damages, consequential damages, punitive damages, pre-judgment and post-judgment interest, and the attorneys' fees and costs Empery incurs in prosecuting this action; and

(d)     Grant all other relief, at law or in equity, to which Empery, either as a noteholder and/or as Collateral Agent, is entitled, including without limitation posting a bond relating to the damages that the Secured Noteholders have incurred and will continue to incur relating to the defendants' wrongful conduct.

Dated: New York, New York
      January 11, 2022

SCHULTE ROTH & ZABEL LLP

*/s/ Gayle R. Klein*

Gayle R. Klein
Andrew D. Gladstein
Hannah M. Thibideau
919 Third Avenue
New York, NY  10022
Telephone: 212.756.2000

*Attorneys for Plaintiff Empery Tax Efficient,
LP*